UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Scott Traudt

　　　v.                                    Civil No. 10-cv-12-JL
                                          Opinion No. 2013 DNH 094
Phillip Roberts *et al.*

**MEMORANDUM ORDER**

In October 2008, a jury in Grafton County Superior Court
convicted the plaintiff, Scott Traudt, of one count of simple
assault and one count of disorderly conduct.  See N.H. Rev. Stat.
Ann. §§ 631:2-a, I(a), 644:2, II(d).  These convictions arose out
of Traudt's actions early one morning in January 2007, after
police in Lebanon, New Hampshire, stopped a vehicle, being driven
by his then-wife, in which Traudt was a passenger.  Traudt was
charged with interfering with the ensuing investigation by
yelling while the officers were trying to administer sobriety
tests to his then-wife, and striking a Lebanon Police officer,
Phillip Roberts, in the head with a closed fist.  (The jury
acquitted Traudt of a second charge of simple assault alleging
that he "picked up" a second officer, Richard Smolenski, "by the
leg and body slammed him on the ground.")

After receiving a sentence of one to three years in prison,
Traudt appealed his convictions to the New Hampshire Supreme
Court, which affirmed them.  New Hampshire v. Traudt, No. 2009-

150 (N.H. Feb. 4, 2010).  Traudt also, by his own account, filed
at least seven different motions seeking post-conviction relief
from the Grafton County Superior Court between November 2008 and
May 2011.  These motions (some of which were filed through
counsel, and others pro se) have all been denied.

In the meantime, in January 2010, Traudt, proceeding pro se,
commenced this action against Roberts, Smolenski, and the Chief
of the Lebanon Police Department, Jim Alexander.  Traudt's
amended complaint seeks damages for alleged violations of his
federal constitutional rights by these defendants, as well as the
City of Lebanon, under 42 U.S.C. §§ 1983 and 1985, and the
Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§§ 1961 et seq. ("RICO", as well as for common-law assault.
Traudt claims that, in arresting him, Roberts and Smolenski
(1) were acting in retaliation for Traudt's exercise of his First
Amendment rights, (2) lacked probable cause, and used excessive
force, in violation of his Fourth Amendment rights, and
(3) committed common-law assault.  Traudt also claims that
Roberts, Smolenski, and Alexander conspired to deprive Traudt of
his Sixth Amendment right to a fair trial and his Fourteenth
Amendment right to equal protection by, among other things,
offering perjured testimony, and other "falsified" evidence,
during the criminal proceedings.  This court has jurisdiction

2

over this action under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

After this action commenced, this court entered a stay so that Traudt could pursue his sixth motion for post-conviction relief in state court.  After Traudt advised that the New Hampshire Supreme Court had affirmed the Superior Court's denial of that motion, New Hampshire v. Traudt, No. 2011-591 (N.H. May 17, 2012) (unpublished disposition), this court lifted the stay and entered a scheduling order.  Following a period of discovery, the defendants moved for summary judgment.  See Fed. R. Civ. P. 56.  They argue, among other things, that:

  •Traudt's First Amendment, Fourth Amendment, conspiracy, and RICO claims are barred by the rule in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994);

  •Traudt's First Amendment, Fourth Amendment, and assault claims are barred by the collateral estoppel effect of his convictions;

  •in any event, the officers are entitled to a qualified immunity defense against the excessive force claim, and a justification defense against the assault claim, based on the undisputed facts of record;

  •the record contains insufficient admissible evidence for a rational jury to find that the individual defendants conspired to violate any of Traudt's constitutional rights; and

  •the record contains no evidence supporting Traudt's RICO claim.

3

For the reasons explained below, the court agrees, and grants the defendants' motion for summary judgment.

## I.   **Background**

In their factual statement in support of their motion for summary judgment, see L.R. 7.2(b)(1), the defendants largely accept (for this limited purpose) Traudt's version of the underlying events as set forth in those portions of his testimony from his criminal trial that they have submitted with their motion.  For certain facts, the defendants also rely on portions of the testimony of Traudt's then-wife at that trial, as well as affidavits from Roberts and Smolenski, which attest to their versions of Traudt's arrest as set forth in their official reports of the incident.

Traudt has not come forward with any evidence suggesting a different version of those events.  Although his objection to the summary judgment motion asserts that the defendants' statement of facts "mischaracterizes several events" and that "an exhaustive challenge to all of their 'facts not in dispute' would be lengthy," it goes on to identify just three of the defendants' factual assertions with which Traudt differs (and even those differences are premised on characterizations of either his complaint or the criminal proceedings, rather than any of the

4

facts underlying his arrest).  The result of this approach is that "[a]ll of the properly supported material facts set forth in the [defendants'] factual statement [are] deemed admitted," since Traudt has failed to "properly oppose them" by reference to admissible evidence of record.  See L.R. 7.2(b)(2).

At around 10 p.m. on January 13, 2007, Traudt and his then-wife, Victoria Traudt, visited an establishment in Lebanon called "Club Electra."  At some point, a club employee told Traudt that he was not permitted to consume any more alcohol there.  When another employee later saw Traudt with a beer bottle, he was instructed to leave the premises.  Traudt rode off as the sole passenger in a vehicle driven by Victoria.

At around 12:30 a.m., Roberts, a Lebanon Police officer, stopped Victoria's vehicle for running a red light (though a judge of the then-Lebanon District Court, presiding over the ensuing criminal case against Victoria, later found that she had not in fact run the light, and suppressed the evidence against her resulting from the stop).  Victoria produced her drivers' license but could not find her vehicle registration.  After Roberts returned to his cruiser, however, Victoria exited her vehicle, announcing that she had located her registration. Smolenski then arrived on the scene to assist Roberts, who asked Victoria to submit to field sobriety tests.  She agreed.

As the officers were conducting the tests, Traudt, who had until that point remained inside the vehicle, lost sight of Victoria, so he "made a decision it was time to get out of the car and find out what was going on," as he testified at his subsequent criminal trial.  While Traudt also testified that he then simply inquired of the officers as to what was happening and whether his wife was all right, the officers attest that Traudt disputed their authority to speak with Victoria, and Traudt's amended complaint in this action claims that he "admonish[ed]" the officers "that they had no right to conduct such field sobriety tests."[1]  In any event, there is no dispute that Traudt refused two consecutive orders from Smolenski to get back inside of Victoria's vehicle.

Traudt's amended complaint alleges that, while he was simply "remaining motionless but questioning his wife's predicament," Roberts and Smolenski "attacked," charging at Traudt and knocking him to the ground after Roberts "yelled, 'Go!'"  Traudt's amended complaint further alleges that Roberts and Smolenski then "dragged [him] around the front of the car, still face down with arms behind his back," where they "choked, repeatedly punched,

---

[1]Although Traudt now says in his summary objection that this allegation was merely intended to relay the officers' version of events, rather than his own, this position only weakens his case by eliminating any claim to protected speech.  See infra note 9.

pepper sprayed, and used a baton to strike" him.  Traudt has not,
however, come forward with any admissible evidence supporting
this version of events.[2]

The officers, for their part, rely on the version of the
encounter set forth in their official reports.  In relevant part,
they recount that, after Traudt refused to comply with the
officers' orders to get back into the vehicle--even after an
express warning that he would be arrested for disorderly conduct
if he did not--Roberts told Traudt he was under arrest, directing
him to put his arms behind his back.  Traudt did not comply with
this order, either, and turned away from the officers as each
grabbed one of his arms.  A struggle ensued as Traudt attempted
to free himself, announcing, "You want to fight, I'll fight."
Traudt is 6' 4" tall and weighs more than 200 pounds.

Traudt succeeded in freeing his right arm, which he then
used to throw a punch at Roberts, landing it on the side of his
head and knocking Roberts to the ground.  Smolenski, meanwhile,
continued to grapple with Traudt; both of them fell to the ground

---

[2]While both the defendants and Traudt have submitted
portions of the transcript from his criminal trial with their
summary judgment filings, they do not include any testimony by
Traudt as to the officers' use of force against him (though they
do include Traudt's testimony that the officers twice "screamed
at" him to get back inside the vehicle).  Traudt has also
submitted an affidavit, but that likewise does not contain any
account of the officers' use of force.  See infra Part II.C.

as Roberts rejoined the fray, striking Traudt in the ribs with a
knee.  Traudt landed on top of Smolenski as both officers
struggled, vainly, to gain control of Traudt's arms.  As Traudt
drew his arm back, apparently readying to throw a punch at the
supine Smolenski, Smolenski struck Traudt several times in the
head, while Roberts doused Traudt in the face with a one-second
blast of pepper spray.  But Traudt continued to struggle,
grabbing at Roberts's belt in what Roberts perceived as a
potential attempt to take control of his firearm.  Roberts
responded by punching Traudt several times in the head.  Traudt
then said, "OK, I'm done," as Smolenski managed to free himself.

Traudt was now in a prone position with his hands underneath
his body.  After he refused to produce his hands for cuffing,
Smolenski deployed his baton, first in an effort to pry Traudt's
hands from underneath him and--when that proved unsuccessful and
Traudt began struggling with Roberts in an attempt to regain a
standing position--to strike Traudt twice in the side.  Each of
the officers was then able to gain control of one of Traudt's
hands, enabling Smolenski to handcuff him.  Traudt was placed in
a cruiser and transported to Lebanon Police headquarters, then to
the Grafton County House of Corrections.  He refused medical
attention at both facilities.

As noted at the outset, a jury in Grafton County Superior
Court later convicted Traudt of one charge of simple assault for
striking Roberts in the head with a closed fist, but acquitted
Traudt of a second charge of simple assault for allegedly "body
slamming" Smolenski to the ground.  The jury convicted Traudt of
assaulting Roberts despite Traudt's argument that, if he had made
contact with Roberts, it was privileged as self-defense.  The
jury also convicted Traudt of disorderly conduct for
"interfer[ing] with a police investigation, by disrupting the
performance of field sobriety tests . . . by exiting the stopped
vehicle, yelling in a loud voice distracting the officers
administering and observing the tests, and by continuing to do so
after an order to desist issued by the officers," as charged in
the criminal complaint.  As noted at the outset, these
convictions were affirmed on direct appeal to the New Hampshire
Supreme Court, and still stand despite Traudt's numerous motions
collaterally attacking them, which have all been denied so far.

Traudt was sentenced to a term of one to three years'
incarceration at the New Hampshire State Prison, but was released
on parole in or around May 2010, after serving one year.  Three
years later, in May 2013, Traudt filed a petition for a writ of
habeas corpus in this court, invoking 28 U.S.C. § 2254.  <u>Traudt
v. Foster</u>, No. 13-cv-234 (May 16, 2013).  That petition awaits

9

preliminary review by the Magistrate Judge under Rule 4 of the

Rules Governing § 2254 Proceedings.

The claims set forth in Traudt's amended complaint here are:

• that, in violation of Traudt's First Amendment
rights, the officers actions' "in charging and
assaulting [him] were motivated (in whole or in part)
by [his] admonishment that they had no right to conduct
[] 'field sobriety tests'" on Victoria (count 1);

• that, in violation of Traudt's Fourth Amendment
rights, the officers arrested him even though they
"could not have reasonably concluded that [he] was
committing or about to commit any crime" and used "a
level of force that cannot be justified" (count 2);

• that these same actions amounted to common-law
assault (count 3);

• that the City of Lebanon is liable for that assault
under a theory of respondeat superior (count 4);

• that Smolenski, Roberts, Alexander and others engaged
in a conspiracy to deprive Traudt of his rights to a
fair trial, equal protection, and "privileges and
immunities" (counts 5-7); and

• that Alexander "lead [*sic*] and conducted a racket" in
violation of RICO (count 8).

## II.  **Analysis**

Summary judgment is appropriate where "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  A dispute is "genuine" if it could reasonably be

resolved in either party's favor at trial by a rational finder of

fact, and "material" if it could sway the outcome under applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).

In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" party.  Id.  Nevertheless, "[u]nsupported allegations and speculation do not demonstrate . . . a genuine issue of material fact sufficient to defeat summary judgment."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).  Instead, "[t]o defeat a motion for summary judgment, the nonmoving party must 'set forth specific facts showing that there is a genuine issue for trial.'"  Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

Under these standards, the defendants are entitled to summary judgment on all of Traudt's claims.  As explained below:

• because Traudt's claims of conspiracy and RICO violations seek damages for his conviction and imprisonment on the assault and disorderly conduct charges, or otherwise call the validity of those convictions or the resulting sentence into question, they are barred by Heck v. Humphrey, supra;

• Traudt's disorderly conduct conviction likewise precludes his false arrest claim under New Hampshire's version of the collateral estoppel doctrine;

• based on the officers' version of Traudt's arrest, which he has not submitted any evidence to dispute,

11

they are entitled to qualified immunity on his Fourth
Amendment excessive force claim, as well as a
justification defense against his assault claim;

• Traudt has not come forward with any evidence
supporting his claim that the officers used force
against him in retaliation for exercising his First
Amendment rights;

• Traudt has also not come forward with any evidence
that any constitutional violation the officers visited
upon him resulted from any municipal custom or policy;

• there is no evidence from which a rational jury could
find that the defendants conspired to violate Traudt's
constitutional rights, insofar as his conspiracy claims
are not barred by Heck; and

• Traudt has likewise adduced no evidence of the
pattern of racketeering activity, or harm to him from
it, necessary to prove his RICO claim (insofar as it is
also not barred by Heck).

The end result is that the defendants, for one reason or another,

are entitled to summary judgment on all of Traudt's claims.

### A.   Heck v. Humphrey

#### 1.   Heck's applicability to Traudt

In Heck v. Humphrey, supra, the Supreme Court imposed a

barrier to § 1983 actions seeking "to recover damages for

allegedly unconstitutional conviction or imprisonment, or for

other harm caused by actions whose unlawfulness would render a

conviction or sentence invalid." 512 U.S. at 486-87 (footnote

omitted).  To do so, the Court held, "a plaintiff must prove that

the conviction or sentence has been reversed on direct appeal,

12

expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. As discussed supra, nothing of the sort has happened to undermine Traudt's convictions for simple assault and disorderly conduct, despite his repeated attempts at post-conviction relief in the state courts. Thus, the defendants argue, the rule of Heck bars Traudt's federal claims in this action, which "necessarily impugn the validity of his convictions."

Traudt argues in his summary judgment objection that Heck does not apply here at all because he is "legally precluded from pursuing habeas relief." Traudt does not explain precisely what he means by this and, as already noted, he has filed a petition in this court seeking that very relief. See Traudt v. Foster, supra. But since Traudt's summary judgment objection relies heavily on a concurring opinion in Spencer v. Kemna, 523 U.S. 1 (1998), and cases from other courts that have adopted it, this court takes Traudt to suggest that, because he is no longer in custody and therefore cannot obtain habeas relief from his convictions, the rule in Heck does not apply to him, and he may, in essence, bring § 1983 claims challenging the validity of his convictions even though they remain in effect.

Putting aside the fact that, again, Traudt has a petition for habeas relief from his convictions now pending in this very forum, this court cannot accept Traudt's argument, because it is at odds with controlling precedent from the First Circuit Court of Appeals, namely, Figueroa v. Rivera, 147 F.3d 77, 80-81 & n.3 (1st Cir. 1998).  In Figueroa, the family members of an inmate who had died while serving his sentence brought § 1983 claims on behalf of his estate against various officials responsible for securing the conviction, alleging, among other things, that the investigating officers had "spun a web of lies," "coerced witnesses to prevaricate," and then "undertook a pattern of deceit to conceal their unlawfulness."  Id. at 80.  Because "no authorized tribunal or executive body [had] overturned or otherwise invalidated [the] conviction," the district court dismissed these claims as barred by the rule in Heck.  Id.

In affirming, the Court of Appeals rejected the plaintiffs' argument that "strict application of Heck works a fundamental unfairness in this case," since the inmate "was attempting to impugn his conviction when death intervened," mooting his then-pending petition for habeas relief.  Id. at 80-81.  While the Court of Appeals allowed that "this plaint strikes a responsive chord," it nevertheless decided against "[c]reating an equitable exception" to the rule announced in Heck.  Id. at 81.  Most

14

importantly, the Court of Appeals noted that "dicta from concurring and dissenting opinions in" Spencer "may cast doubt upon the universality of Heck's 'favorable termination' requirement," but declined to follow that dicta on the theory that the Supreme Court "has admonished the lower federal courts to follow its directly applicable precedent, even if [it] appears weakened by pronouncements in its subsequent decisions, and to leave to the Court the prerogative of overruling is own decisions." Id. at 81 n.3 (quotation marks omitted).

This court, of course, is bound to follow directly applicable precedent from the Court of Appeals for the First Circuit. That precedent, Figueroa, expressly rejects the notion that--notwithstanding the concurring opinion in Spencer--Heck does not apply when the plaintiff can no longer obtain habeas relief from the conviction that his § 1983 suit calls into question. See also Thore v. Howe, 466 F.3d 173, 180 (1st Cir. 2006) ("Notably, Figueroa held that there are no equitable exceptions to the Heck rule."). In fealty to that precedent, this court rejects what it understands to be Traudt's argument that, because he has been released from custody and therefore can no longer obtain habeas relief from his convictions, Heck does not apply. See Batavitchene v. O'Malley, No. 13-10729, 2013 WL 1682376, at *4-*5 (D. Mass. Apr. 16, 2013) ("[t]he Heck rule is

15

applicable even where . . . [the plaintiff] is no longer in custody and thus does not have a habeas remedy," since Figueroa "explicitly held that Heck applies even where habeas relief is unavailable" and "is still the law in this circuit").

### 2.   Scope of **Heck**

While Heck applies despite Traudt's release from custody, the question remains whether it applies to all of the federal claims he has brought in this action.  As the Court of Appeals has recognized, Heck bars a claim "[o]nly if a 'judgment in favor of the plaintiff would necessarily imply the invalidity of the conviction or sentence.'"  Thore, 466 F.3d at 179 (quoting Heck, 512 U.S. at 487).  Applying that test, this court concludes that the rule in Heck bars Traudt's conspiracy and RICO claims.  While Heck arguably bars Traudt's First Amendment retaliation and Fourth Amendment claims as well, the court need not decide that issue, since the defendants are entitled to summary judgment on those claims on other grounds.[3]  See infra Parts II.C-D.

--------

[3]The Court of Appeals has recognized that neither an excessive force nor a false arrest claim necessarily impugns the validity of the plaintiff's underlying conviction so as to implicate Heck.  See Thore, 466 F.3d at 180 (excessive force); Parra v. New Hampshire, 40 F.3d 1235 (1st Cir. 1994) (table), 1994 WL 637001, at *2 (false arrest).  Thore, in fact, noted that this was so even where the underlying conviction was for assaulting the defendant officer during the arrest.  466 F.3d at 180.  It is true that Thore also recognized that a plaintiff's theory "that he was not guilty of assault at all, and so [the

Traudt's amended complaint charges a conspiracy among Smolenski, Roberts, and Alexander "to deprive [Traudt] of his rights to a fair trial," "to prevent [him] from having the equal protection of the laws," and to "violate[] [his] privileges and immunities."  In furtherance of this conspiracy, Traudt alleges, both Smolenski and Roberts presented false testimony at Traudt's criminal trial and "falsified" their official reports of his arrest, while Roberts also "falsified reports of his injuries to help secure the harshest possible sentenc[e]."  This was all done, Traudt says, with Alexander's "approval and subornation." Traudt further claims that Alexander undertook these actions, among others, as part of a pattern of racketeering activity in furtherance of a RICO enterprise.  Traudt says the defendants' actions to advance the conspiracy and RICO enterprise have damaged him "in name, person, time (prison time away from his daughter and family), employment, and future income generation."

Through these claims, Traudt plainly seeks "to recover damages for allegedly unconstitutional conviction or

_____

officer's] use of force was excessive . . . is plainly barred by Heck," id.--and that is one of the theories set forth in Traudt's amended complaint.  But Traudt's amended complaint also alleges "continued pummeling . . . after he was thrown to the ground and subdued"--which, as Thore recognizes, is the sort of excessive force theory not necessarily barred by Heck.  Id.  Again, this court need not decide the extent to which Heck applies to Traudt's excessive force or false arrest claims.

imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." Heck, 512 U.S. at 486-87.  Indeed, this result is clear from Figueroa which, as just discussed, held that Heck barred § 1983 claims that police officers "spun a web of lies to ensure [the inmate's] conviction, and, in the bargain, coerced witnesses to prevaricate," then "undertook a pattern of deceit to conceal their lawlessness."  147 F.3d at 80.  While Traudt's RICO claim does not depend on § 1983, the result is the same, because the Court of Appeals has held that "Heck's bar cannot be circumvented by substituting a proposed RICO action" for claims of constitutional violations by government officials.  Swan v. Barbadoro, 520 F.3d 24, 26 (1st Cir. 2008).  Accordingly, Traudt's conspiracy and RICO claims are barred by Heck, at least to the extent that they rely on the officers' alleged presentation of false testimony and other "falsified" evidence at his criminal trial and sentencing.

**B.   Issue preclusion**

In addition to arguing that Traudt's convictions for disorderly conduct and simple assault bar his federal claims under Heck, the defendants make the similar point that those convictions bar his Fourth Amendment claims under the New

18

Hampshire doctrine of issue preclusion.  New Hampshire law governs the preclusive effect of Traudt's judgments of conviction in the New Hampshire Superior Court.  See, e.g., Dillon v. Select Portfolio Servicing, 630 F.3d 75, 80 (1st Cir. 2011).  New Hampshire follows "the general rule that a judgment in favor of the prosecuting authority in an earlier prosecution is preclusive in favor of a third person," and against the criminal defendant, in a subsequent civil action.  Hopps v. Utica Mut. Ins. Co., 127 N.H. 508, 511 (1985) (adopting Restatement (Second) of Judgments § 85(2)(a) (1982)).

Furthermore, this rule applies regardless of the defendant's efforts at collaterally attacking the judgment of conviction, so long as those attacks remain unsuccessful.  See Stewart v. Bader, 154 N.H. 75, 83-85 (2006).  "Simply put, despite [a party's] assertion that he is actually innocent of the crime for which he was convicted, unless and until his conviction is overturned, it is deemed valid and is entitled to preclusive effect under the collateral estoppel doctrine."  Id. (emphasis added).  Because Traudt's convictions remain valid, despite his repeated attempts at collaterally attacking them, they are entitled to preclusive effect here.  See id. at 83-85.

The "clearest situation" for giving preclusive effect to a criminal conviction "is where the person who was convicted of an

19

offense brings an action against the third party to assert a claim that rests on factual premises inconsistent with those established in the criminal prosecution." Restatement (Second) of Judgments § 85 cmt. *e*, at 298-99.  The "factual premise" of Traudt's false arrest claim is that, at the time the officers first "grabbed" him, they "could not have reasonably concluded that he was committing or about to commit any crime."  That is flatly inconsistent with the facts established in the criminal case against Traudt, where the jury convicted him of disorderly conduct based on a complaint that he "interfered with a police investigation, by disrupting the performance of field sobriety tests . . . by exiting the stopped vehicle, yelling in a loud voice distracting the officers administering and observing the tests, and by continuing to do so after an order to desist issued by the officers."  So Traudt's false arrest claim is precluded by his disorderly conduct conviction.  See, e.g., Franklin v. Thompson, 981 F.2d 1168, 1170 (10th Cir. 1992).

The court does not reach the question of whether Traudt's convictions also preclude his excessive force claim.[4]  The

---

[4]Just as a plaintiff's conviction for assaulting an officer does not necessarily bar an excessive force claim under Heck, "a guilty verdict in state court for . . . offenses such as assault on a police officer does not necessarily preclude a subsequent claim of excessive force" under the doctrine of issue preclusion. Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) (citing

defendants are entitled to summary judgment on Traudt's Fourth
Amendment claim insofar as it alleges that he was arrested
without probable cause.

### C.   Qualified immunity and statutory justification

The officers maintain that they are entitled to qualified
immunity against the excessive force claim, and a statutory
justification defense against the assault claim.  These defenses
are based on the officers' version of events as set forth in
their official reports of the arrest.  Once "a party seeking
summary judgment make[s] a preliminary showing that no genuine
issue of material fact exists . . . , the nonmovant must
contradict this showing by pointing to specific facts
demonstrating that there is, indeed, a trialworthy issue." Nat'l
Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.
1995).  To do so, and to avoid summary judgment, the nonmovant
must come forward with evidence that "has substance in the sense
that it limns differing versions of the truth." Id. (quotation
marks omitted).

--------

cases from various federal courts of appeals).  As already noted,
Traudt's assault conviction is not necessarily inconsistent with
his excessive force claim insofar as it alleges that the officers
persisted in "pummeling" him after he had been "subdued."  See
note 3, supra.

Again, in his submissions in response to the defendants'
summary judgment motion, Traudt has not come forward with any
evidence supporting a version of the events of his arrest that
differs from the officers' version.  <u>See</u> note 2 and accompanying
text, <u>supra</u>.  Most glaringly, while Traudt submits an affidavit
and portions of the transcript of his criminal trial, those
materials do not address either his actions, or the officers' use
of force against him, during his arrest.[5]  It is not enough for
Traudt simply to assert, as he does in his summary judgment
objection, that he "does not accept defendants' version of facts
for purposes of this motion" or that "defendants mischaracterize
several events."  <u>See</u>, <u>e.g.</u>, <u>Nieves v. Univ. of P.R.</u>, <u>7 F.3d 270,
280 (1st Cir. 1993)</u> ("a party may not generate a trial-worthy
dispute at summary judgment merely by presenting unsubstantiated
allegations in its memoranda").

As the Court of Appeals has warned, "the decision to sit
idly by and allow the summary judgment proponent to configure the
summary judgment record is likely to prove fraught with

---

[5]Instead, Traudt dedicates his affidavit largely to relaying
a hearsay account of an alleged disciplinary action that the
Lebanon Police Department took against Smolenksi for actions
that, even on Traudt's stated understanding of them, are
completely unrelated to Traudt's arrest or prosecution (or any
arrest or prosecution).  Among other problems with this
"testimony," it is obviously irrelevant to Traudt's excessive
force and assault claims.

consequence." Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991).  That is the case here, because the only version of Traudt's arrest set forth in the summary judgment record is that of the officers, and it demonstrates that they are entitled to summary judgment on Traudt's excessive force and assault claims based on their qualified immunity and justification defenses.

### 1. Qualified immunity

"Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Brosseau v. Hagan, 543 U.S. 194, 198 (2004).  The Court of Appeals generally describes qualified immunity as a two-step inquiry:  "(1) whether [the officer] has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." Raiche v. Pietroski, 623 F.3d 30, 34 (1st Cir. 2010).  These elements "need not be considered in any particular order," but both "must be satisfied for a plaintiff to overcome a qualified immunity defense." Id.

The Fourth Amendment, in relevant part, protects "against unreasonable searches and seizures." U.S. Const. Am. IV.  As the Supreme Court has held, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth

Amendment . . . requires careful attention to the facts and
circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate threat
to the safety of the officers, and whether he is actively
resisting arrest or attempting to evade by flight." Graham v.
Connor, 490 U.S. 386, 396 (1989).

So while "[t]here is no doubt," as a "general proposition,"
that an officer's "use of force is contrary to the Fourth
Amendment if it is excessive under objective standards of
reasonableness," the Supreme Court has cautioned that this "is
not enough" to overcome qualified immunity on a Fourth Amendment
excessive force claim. Brosseau, 543 U.S. at 198 (formatting
altered).  Instead, "the relevant, dispositive inquiry in
determining whether a right is clearly established" for purposes
of qualified immunity "is whether it would be clear to a
reasonable officer that his conduct was unlawful in the situation
he confronted." Id. at 199 (formatting altered).  This test
takes into account that "reasonable people sometimes make
mistaken judgments," so that, on an excessive force claim,
"defeating a qualified immunity defense requires a showing of an
incremental degree of error--an incommensurate use of force
beyond that needed to establish a garden variety excessive force
claim and, further, beyond the hazy border" that demarcates

"excessive [from] unacceptable force." Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009).

The officers' undisputed account of Traudt's arrest establishes that their use of force was far from "incommensurate" so as to defeat their qualified immunity defense. To the contrary, each application of force was at least roughly proportional to the increasingly violent resistance put up by Traudt. When he struggled with the officers as they attempted to arrest him, they struggled back. After he punched Roberts in the head and began getting the upper hand against Smolenski, Roberts kneed Traudt in the side. As Traudt, then on top of Smolenkski, drew his arm back to punch him, Smolenski began striking Traudt in the head, while Roberts deployed pepper spray at Traudt's face. When Traudt nevertheless began reaching for Roberts' belt, Roberts punched Traudt in the head. When Traudt, finally brought down, still refused to produce his hands, Smolenski used his baton to try to pry Traudt's hands out from under him. After that proved unsuccessful and Traudt attempted to regain his footing and resume grappling with Roberts, Smolenski used the baton to strike Traudt twice in the ribs.

Based on this sequence of events, this court cannot say that "the level[s] of the force chosen by the officer[s] cannot in any way, shape, or form be justified" so as to defeat qualified

immunity.  Id. at 24.  An instructive case is Statchen v. Palmer, 623 F.3d 15 (1st Cir. 2010).  There, after encountering the plaintiff, who was plainly intoxicated and bore a black eye that he attributed to an earlier fight--boasting that "the other guy looked worse"--two police officers attempted to take the plaintiff into protective custody.  Id. at 16-17.  The officers ordered him to present his hands for cuffing, but the plaintiff "assumed a posture . . . to brace himself as the officers moved to pinion him."  Id. at 17.  After the plaintiff finally "tumbled to the ground," a "brief melee ensued, with the officers kneeing and hitting [him] until finally he stopped struggling and verbally acquiesced."  Id.  Noting the evidence of "knees and punches thrown at [the plaintiff] in the struggle," the Court of Appeals ruled that the officers were nevertheless entitled to qualified immunity against his excessive force claim, since they "used no more force than necessary to muscle a large and uncooperative man into handcuffs--or, at least, it was reasonable to think such force necessary, given [his] intransigence, intoxication and description of his [prior] fight."  Id. at 19.

The undisputed facts of Traudt's arrest are largely similar, and necessitate the same result.  Traudt is also a large man, and while he did not display the same sure signs of intoxication as the plaintiff in Statchen, there was considerable evidence to

that effect, including his then-wife's apparent intoxication, his refusal to cease his disruptive behavior and get back into the car, and his challenging the officers to "fight" if they wished. While the officers here used force that exceeded the force used in Statchen, namely, a blast of pepper spray and two strikes from a baton, the resistance Traudt offered likewise exceeded the resistance offered by the plaintiff in Statchen, namely, a punch to the head of one officer, and an attempt to punch the other.[6] In any event, in general, "using pepper spray is reasonable where the plaintiff was either resisting arrest or refusing police requests," Kenney v. Floyd, 700 F.3d 604, 610 (1st Cir. 2012) (quotation marks, bracketing, and ellipse omitted), as is using a baton to prevent a suspect who has already landed one punch in a melee from throwing another one, Rodriguez-Rodriguez v. Ortiz-Velez, 391 F.3d 36, 40 (1st Cir. 2004).  But the most important parallel between this case and Statchen is the absence of any

---

[6]Traudt points to what he sees as inconsistencies in various accounts, given during the criminal proceedings, of the punch he landed on Roberts, particularly as to how badly it hurt him.  But even assuming, as Traudt argues, that his blow left Roberts "uninjured," the court is at a loss to see how that affects the reasonableness of the force the officers used.  It remains undisputed that, after punching Roberts, Traudt continued to struggle with Smolenski, including drawing his arm back to punch him--and that it was this action that caused Smolenksi to begin striking Traudt in the head, and Roberts to deploy pepper spray against him.

evidence[7]--as opposed to allegations in the amended complaint,
see notes 3-4, supra--that the officers "continued to strike [the
plaintiff] after he stopped resisting."  623 F.3d at 18.

In gauging the force used to make an arrest, the Fourth
Amendment's "calculus of reasonableness must embody allowance for
the fact that police officers are often forced to make split-
second judgments--in circumstances that are tense, uncertain, and
rapidly evolving--about the amount of force that is necessary in
a particular situation."  Graham, 490 U.S. at 396.  The officers
here faced those kind of circumstances in attempting to arrest
Traudt despite his prolonged and violent resistance, and their
judgments as to how much force to use as the encounter escalated
were not so mistaken (if mistaken at all) that no reasonable
officer would have made them.  Accordingly, the defendants are

---

[7]So far as the court can tell, Traudt's medical records
(which he says show that he suffered a concussion, torn rotator
cuff, and neck injury during his arrest) are the only evidence he
submits that has even arguable relevance to his excessive force
and assault claims.  "Injury and force, however, are only
imperfectly correlated, and it is the latter that ultimately
counts" in proving an excessive force claim, Wilkins v. Gaddy,
559 U.S. 34, 38 (2010), so, in general, "the mere fact of
consequent injury is not enough to establish excessive force" in
violation of the Fourth Amendment.  Luchtel v. Hagemann, 623 F.3d
975, 983 n.3 (9th Cir. 2010); see also Statchen, 623 F.3d at 19
(observing that, while plaintiff "suffered two fractured ribs"
from the officers' use of force, that fact was "not surprising
when a heavy and drunken man is fighting with police officers"
and as such did not create a genuine issue as to the officers'
qualified immunity from the excessive force claim).

entitled to summary judgment on Traudt's excessive force claims based on qualified immunity.

### 2.   Statutory justification

For essentially the same reasons, the officers are entitled to summary judgment on Traudt's state-law assault claim.  Under New Hampshire law, "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention."  N.H. Rev. Stat. Ann. § 627:5, I.  Under this statute, "[w]hether the defendant's beliefs were 'reasonable' is determined by an objective standard."  New Hampshire v. Cunningham, 159 N.H. 103, 107 (2009) (citation omitted).

As just discussed in detail, the officers' version of events, which Traudt has not furnished any evidence to dispute, demonstrates that the force they used to effect his arrest was objectively reasonable under the Fourth Amendment.  It follows that the force was justified under § 627:5, I.  See Statchen v. Palmer, 2009 DNH 137, 26 (observing that § 627:5, I "echoes the standard for qualified immunity" on an excessive force claim), aff'd on other grounds, 623 F.3d 15 (1st Cir. 2010); see also Raiche, 623 F.3d at 40 ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault

. . . , [the] determination of the reasonableness of the force used under § 1983 controls . . . the reasonableness of the force under the common law assault . . . claim[].").

### 3.  First Amendment retaliation

Traudt claims that the officers' use of force against him violated not only the Fourth Amendment, but also the First Amendment, which, in relevant part, prevents laws "abridging the freedom of speech."[8] U.S. Const. Am. I.  To prevail on a First Amendment retaliation claim arising out of a law enforcement

---

[8]The court does not understand Traudt's First Amendment claim to allege retaliation in the form of the arrest itself, but rather the force used to carry it out.  Insofar as Traudt is claiming that the officers arrested him in retaliation for exercising his First Amendment rights, the officers would be entitled to qualified immunity from that claim, because (as the disorderly conduct conviction establishes, see Part II.B, supra) the arrest was supported by probable cause.  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (recognizing officer's qualified immunity against such a claim since it is not yet "clearly established that an arrest supported by probable cause could violate the First Amendment"); Holland v. City of Portland, 102 F.3d 6, 10 (1st Cir. 1996) (observing that "[t]he decision to arrest, where probable cause exists, is a discretionary one informed by many considerations" and warning against "any attempt to untangle the ascribed motive from a skein of others, in prompting an arrest justified by objective probable cause").  By analogy, this line of authority may also call into question the validity of Traudt's claim that the officers used force against him in retaliation for his exercising his First Amendment rights; if the use of force did not violate the Fourth Amendment, it seems that the officers' reasons for using that force--including any intention to retaliate against Traudt for his speech--would be irrelevant to the force's legality.  See Graham, 490 U.S. at 396.  But the court need not reach that issue.

officer's actions during an arrest, the plaintiff must "show that the officer's intent or desire to curb the expression was the <u>determining</u> or <u>motivating</u> factor" for his actions, "in the sense that the officer would not have [taken those actions] 'but for' that determining factor." Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994). In support of his retaliation claim, Traudt's amended complaint alleges that the officers' actions in "charging and assaulting him were motivated (in whole or in part) by [his] admonishment that they had no right to conduct [] 'field sobriety tests'" on Victoria.[9]

Again, though, Traudt has come forward with no evidence supporting this version of events, and the officers' version is markedly different. They say that, after Traudt refused to comply with their orders to get back into the vehicle (even after an express warning that he would be arrested for disorderly conduct if he did not), Roberts told Traudt he was under arrest,

---

[9]As noted above, Traudt appears to disclaim this allegation in his summary judgment objection, explaining that he "says only that the defendants <u>alleged</u> that he made the above comments." If Traudt is in fact denying that he "admonished" the officers, then it is unclear what constitutionally protected activity on his part could have motivated the officers to attack him, as he alleges. Indeed, if Traudt is withdrawing his allegation that he "admonished" the officers, it would seem that he fails even to state a claim for First Amendment retaliation. In any event, the court considers the version of Traudt's retaliation claim alleged in his amended complaint, i.e., that the officers attacked him because he "admonished" them over conducting the tests.

directing him to put his arms behind his back.  It was not until Traudt refused to comply with this order that the officers first used any force against him, attempting to grab his arms as he turned away from them.  And it was not until the ensuing melee, in which Traudt punched Roberts in the head, that the officers brought Traudt to the ground, and continued to escalate their use of force against him as he continued to violently resist.

The undisputed evidence of record, then, shows that the officers did not "charge and assault" Traudt after he "admonished" them, but that they attempted to grab his hands after he refused an order to present his hands for cuffing, then brought him to the ground and continued to use force against him in the struggle that followed.  Based on this sequence of events, any rational jury would have to find that it was not Traudt's allegedly protected speech "admonishing" the officers but, rather, his conduct in refusing to submit to an arrest (which, again, was supported by probable cause, see Part II.B, supra) that was the "determining or motivating" factor in their use of force against him.  Tatro, 41 F.3d at 18.

In his summary judgment objection, Traudt does not meaningfully address the issue of the officers' motivation, offering only the naked assertion that the officers "knew they were going after constitutionally protected free speech and

assembly when they arrested the unarmed, non-suspicious plaintiff."[10]   This statement is not only unsupported by citation to any record evidence, it is irrelevant.  The officers do not say that they used force against Traudt because they thought he was armed or otherwise "suspicious," but because he was violently fighting their efforts to place him under arrest.  Since Traudt has failed to demonstrate a genuine issue of material fact as to the officers' motivations, the defendants are entitled to summary judgment on his claim that they used force against him in retaliation for his exercise of his First Amendment rights.

### E.   Municipal liability

Because, again, the officers' use of force against Traudt was justified, rather than tortious, under New Hampshire law, see Part II.C.2, supra, the City of Lebanon is not liable for that use of force under theory of respondeat superior.  See Statchen, 2009 DNH 137, 26-27 (ruling that city was not vicariously liable for the actions of its police officers that were justified under § 627:5, I).  Traudt's amended complaint alleges that the City is

---

[10]Traudt also argues that the conduct for which he was convicted was protected by the First Amendment and that the New Hampshire disorderly conduct statute is unconstitutional.  These claims (which are not set forth in the amended complaint, in any event) attack the validity of Traudt's disorderly conduct conviction and, as such, are barred by Heck.  See Part II.A, supra; Gilles v. Davis, 427 F.3d 197, 209 (3d Cir. 2005).

also liable for the officers' alleged violations of his First and
Fourth Amendment rights on a theory of respondeat superior.

But "a municipality cannot be held liable for the
constitutional violations of municipal employees on a respondeat
superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658,
691 (1978). Instead, liability attaches to a municipality under
§ 1983 only if the violation occurs pursuant to an official
policy or custom." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d
756, 769 (1st Cir. 2010) (quotation marks omitted). Traudt has
adduced no evidence of any such policy or custom here, and, while
his summary judgment objection charges that the City is
"complicit in the destruction of possibly exculpatory . . .
materials as per union contract" with its police officers, that
charge, even if proven, would obviously not tend to show a policy
or custom of perpetrating First or Fourth Amendment violations
during arrests. The City is entitled to summary judgment.

**F.   Lack of evidence for conspiracy claims**

Traudt's claims that the officers joined together with
Alexander in a conspiracy to violate his constitutional rights,
by presenting perjured testimony and other falsified evidence at
his criminal trial and sentencing, are plainly barred by the rule
in Heck, as interpreted by the court of appeals in Figueroa. See

34

Part II.A.2, supra.  Insofar as Heck does not apply to these claims--either at all, because Traudt is no longer in custody, or to the extent that certain of the defendants' alleged acts in furtherance of the conspiracy did not affect his convictions or sentence--the defendants are entitled to summary judgment on the conspiracy claims nonetheless, because Traudt has failed to come forward with evidence from which a rational jury could find an agreement to violate his constitutional rights, or any actual violation of his constitutional rights as a result.

"A civil rights conspiracy as commonly defined is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another." Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988).  To try to show the existence of such a conspiracy, Traudt relies heavily on what appears to be a partial transcript of what he describes as a "digitally enhanced" recording taken at the Lebanon Police Station while he was being booked.

In the portion of the transcript submitted by Traudt, he threatens to charge the officers with some unspecified crime, tells one of them he should "get legal advice," and refuses to be fingerprinted.  Roberts then states, according to the transcript,

35

"My intention is that we all say that he did [inaudible]," then, after Smolenski says, "It's all right.  Oh, yeah," Roberts says, "I brought him down even though it wasn't a direct hit."  After some more discussion, much of which is indicated in the transcript as "inaudible," Traudt refuses Smolenksi's offer to administer a breath test.

While this portion of the purported transcript bears the name of a stenographer, and identifies the speakers, Traudt also offers another "transcript," which does neither, simply identifying the speakers as "Officer 1" and "Officer 2."  Traudt asserts in his summary judgment objection that this "transcript" is the result of the efforts of a claimed "expert" to "enhance[] the audio" of a "conversation in which Officer 1 is Roberts and Officer 2 is Smolenski," which took place after "Roberts ask[ed] Smolenski to step outside into the garage/sally port area" from the booking area--though Traudt provides no evidentiary support for this assertion.  At the outset of this "conversation," as set forth in the "transcript," the speaker Traudt identifies as Roberts says, "Do you have a problem with this?  You're worried about this for nothing."  After the speaker Traudt identifies as Smolenksi says, "But I don't want to get into trouble [Inaudible].  All I'm saying is that [Inaudible]," the speaker Traudt identifies as Roberts says, "Then he wouldn't be able to

36

say that [Inaudible]."  Several comments transcribed as

"[Inaudible]" follow, before the speaker Traudt identifies as

Smolenski says, "I was explaining that to him [Inaudible]," and

the speaker Traudt identifies as Roberts says, "You will have to

say that [Inaudible] first [Inaudible]."

There are three independent reasons why these materials do

not create a genuine issue as to the existence of the alleged

conspiracy to present falsified evidence against Traudt.  Before

explaining those reasons, though, is worth noting that--despite

Traudt's presence during the portion of the recorded conversation

that took place in the booking area--he has submitted no

affidavit attesting to the content of the inaudible portion of

Roberts's comment or, indeed, any aspect of the conversation

tending to support his conspiracy claims.  Nor has Traudt

submitted an affidavit authenticating the portions of the

conversation that occurred in his presence.

That is a problem in and of itself because, without such

authentication, the purported transcripts of the audio recording

cannot be considered in ruling on their motion for summary

judgment, since they are not "presented in a form that would be

admissible in evidence."  Fed. R. Civ. P. 56(c)(2); see also,

e.g., Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993).  This is

the first reason why the "transcripts" do not create a genuine

issue of material fact as to the alleged conspiracy.  Traudt has

not properly authenticated the "transcripts" under Rule 901(a) of

the Federal Rules of Evidence by "laying a foundation that [they]

accurately reproduce the conversations that took place." United

States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986).  If anything,

he calls that into serious doubt through his otherwise

unexplained statements that the transcripts reflect "digitally

enhanced" versions of the original recordings made by an

"expert"--whose qualifications and methodology Traudt does not

identify.  Furthermore, even after these "enhancements," the

transcripts still mark several portions of the conversations as

"inaudible," and a recording is not admissible when "the

inaudible parts are so substantial as to make the rest more

misleading than helpful."[11]  Id.  The transcripts, then, cannot

be considered as to the existence of a genuine issue of fact on

summary judgment.  See Gomez-Gonzalez v. Rural Opportunities,

Inc., 626 F.3d 654, 666 (1st Cir. 2010) (refusing to consider

---

[11]Traudt filed a motion to compel the defendants to give him
access to the original versions of these recordings in the hope
that they are of better quality, but, as explained in this
court's earlier order, that motion was denied because Traudt has
failed to show that he is entitled to that relief notwithstanding
the defendants' pending motion for summary judgment.  See Order
of July 12, 2013 (document no. 55).

unauthenticated document in reviewing district court's entry of
summary judgment).

Second, even if this problem is ignored and the
"transcripts" are taken at face value, they simply do not amount
to evidence from which a rational jury could find a conspiracy
between Roberts and Smolenski (let alone Alexander, who was
neither present nor referred to during the conversations) to
present false evidence during the criminal proceedings against
Traudt.  Assuming, as Traudt posits, that the portion of the
"conversation" that occurred in the garage outside of the booking
area reflects that "Smolenski is obviously not comfortable with
what Roberts is asking him to do," the balance of the
conversation (most of which is marked "Inaudible") provides no
reasonable basis to infer that "what Roberts is asking" is for
Smolenski to falsify evidence against Traudt.

Traudt also relies heavily on Roberts's statement, made
while the officers were still in the booking area, that "[m]y
intention is that we all say that he did [inaudible]," but that
likewise provides no rational basis to infer the formation of a
such a conspiracy.  The balance of the conversation provides no
hint as to what Roberts is suggesting they all say "he did"
(assuming that "he" is Traudt), or for what purpose.  Indeed,
given that Roberts made this statement while he and the other

officers were still in the booking area itself--and, therefore, in the physical presence of Traudt himself, who was already threatening legal action against them--it would be not only speculation, but wild speculation, to infer that the inaudible portion of the statement contains a suggestion that the officers level false accusations against Traudt.  Again, "[u]nsupported allegations and speculation do not demonstrate . . . a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon, 635 F.3d at 12.

Third, "while conspiracies may be actionable under section 1983, it is necessary that there have been, besides an agreement among the conspirators, an actual deprivation of a right secured by the Constitution and laws" of the United States.  Thore, 466 F.3d at 179 (quotation marks and bracketing omitted).  So, even assuming that Traudt could come forward with admissible proof suggesting that the defendants agreed to present false evidence during the criminal proceedings against him, he would also need admissible proof that they, in fact, presented false evidence, and that this presentation deprived him of some right under the federal Constitution.  Traudt presents no such proof.

Traudt's amended complaint alleges that Smolenski testified falsely that he had witnessed Traudt strike Roberts in the head, while Roberts "perjured himself at [Traudt's] criminal trial by

stating he'd been struck in the head."  Assuming that the
officers in fact gave that testimony (Traudt has not submitted
the relevant portions of the trial transcript), Traudt has not
come forward with any evidence that it was false, i.e., that he
did not in fact strike Roberts in the head, so that Smolenski
could not have seen Traudt do so.  So there is no evidence that
the "conspiracy," if there was one, achieved its intended aim of
depriving Traudt of his federally secured right not to be
convicted on the basis of knowingly false testimony.[12]

---

[12]Traudt's amended complaint alleges that the conspiracy
also embraced "fabricat[ing] police reports," but fails to
identify what aspects of the reports were "fabricated."
Regardless, Traudt has failed to properly dispute the officers'
versions of his arrest set forth in their police reports, as
already discussed at length, see Part II.C.1, supra, so there is
no basis in the record to conclude that anything in the reports
was "fabricated."  Nor has Traudt submitted anything from the
record of his criminal trial to show that the police reports were
used as evidence to secure his conviction.  A concerted attempt
by police to "justify" their use of force against the plaintiff
after the fact does not itself amount to an actionable conspiracy
under § 1983.  See Thore, 466 F.3d at 179-80.
     Traudt also alleges that "Roberts falsified reports of his
injuries to help secure the harshest possible sentencing,"
contrasting his testimony of "concussion-like symptoms at
[Traudt's] sentencing hearing" with an interrogatory answer in
this case denying any concussion.  But Traudt does not provide
the transcript of Roberts's testimony at the sentencing, relying
instead on the prosecutor's characterization of that testimony,
i.e., that Roberts "was out for several seconds.  He was
unconscious."  Whatever else can be said of this comment, it does
not tend to show that Roberts presented knowingly false testimony
at Traudt's sentencing, let alone that he did so in furtherance
of a conspiracy with the other defendants.

In summary, then:  (1) Traudt's proffered evidence of the alleged conspiracy is inadmissible, (2) even if that problem is overlooked, the evidence fails to create a genuine issue as to the existence of the alleged conspiracy, and (3) even if both of those problems are overlooked, Traudt has failed to proffer any evidence that the conspiracy actually deprived him of any of his constitutional rights.  Accordingly, the defendants are entitled to summary judgment on Traudt's conspiracy claims, even if they are not barred by Heck.[13]

### G.   Lack of evidence for RICO claim

In his summary judgment objection, Traudt announces that he "abandons his RICO claim against [] Alexander, and agrees to a dismissal without prejudice should further discovery warrant its resubmittal to the court."  Because the defendants have already filed an answer, and a motion for summary judgment, Traudt cannot simply dismiss one of his claims without prejudice as a matter of

---

[13]Traudt's amended complaint alleges other acts in furtherance of the conspiracy, including arresting and charging Victoria "to use as leverage against" him, making public statements "hoping they would contaminate the jury pool," pursuing an investigation into whether Traudt had committed perjury during his testimony at his criminal trial, and failing to conduct a thorough investigation into Traudt's arrest.  The summary judgment record contains no evidence that these events (1) even occurred, or (2) to the extent they did, were the product of any conspiracy, or (3) for that matter, that they violated any of Traudt's constitutional rights.

right, see Fed. R. Civ. P. 41(a), particularly not in lieu of
responding to the defendants' motion for summary judgment, cf.
Wong v. Smith, 961 F.2d 1018, 1020 (1st Cir. 1992).

Insofar as Traudt is asking this court for leave to dismiss
his RICO claim without prejudice, see Fed. R. Civ. P. 41(a)(2),
he has improperly combined that request with his objection to the
defendants' summary judgment motion in violation of L.R.
7.1(a)(1).  Moreover, Traudt does not make the showing that would
be required for him to dismiss the RICO claim without prejudice
at this stage in the proceedings, after he has enjoyed an ample
opportunity to take discovery relevant to that claim and
Alexander's defense of it has proceeded to filing a motion for
summary judgment.  So Traudt is plainly not entitled to dismiss
the RICO claim without prejudice under Rule 41(a)(2).  See, e.g.,
Doe v. Urohealth Sys., Inc., 216 F.3d 157, 160 (1st Cir. 2000).

Traudt has also failed to come forward with any evidence
supporting his RICO claim, in particular, that there was any
"pattern of racketeering activity," 18 U.S.C. § 1962, or that,
even if there was, that those acts of racketeering were the
proximate cause of any harm to him, see, e.g., George Lussier
Enters., Inc. v. Subaru of New Eng., Inc., 393 F.3d 36, 51 (1st
Cir. 2004).  To the contrary, Traudt's RICO claim either
duplicates the unsupported allegations of his conspiracy claim,

43

or makes generalized complaints of corruption in the Lebanon Police Department.  To the extent the RICO claim is not barred by Heck, Alexander is still entitled to summary judgment on it.

## III. **Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment[14] is GRANTED.  The Clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 15, 2013

cc:  Scott Traudt, pro se
     Charles P. Bauer, Esq.

---

[14]Document no. 17.